# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: PRADAXA (DABIGATRAN ETEXILATE) PRODUCTS LIABILITY LITIGATION | ) 3:12-md-02385 DRH-SCW ) ) ) **MDL No. 2385** |
| Robert Garrett<br>　　　　　　Plaintiff,<br>vs.<br><br>Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH<br>　　　　　　Defendant | ) Judge David R. Herndon ) ) COMPLAINT AND JURY DEMAND ) ) Civil Action No. 3:13-cv-51755-DRH-SCW ) ) ) ) |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff, by and through his undersigned attorney, and files this Complaint against Defendants, Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH ("Boehringer International") for selling, distributing, and manufacturing the defective and unreasonably dangerous drug Pradaxa™ (dabigatran etexilate), a prescription medication used as a blood thinner in the United States, which has proximately caused personal injuries to Plaintiff as further set forth below.

## PARTIES

1. Plaintiff, Robert Garrett, suffered personal injuries as a result of ingesting Pradaxa™. At the time of filing and at the time of Plaintiff's injury, Plaintiff resided in Arkansas. As a direct and proximate result of ingesting Pradaxa™, Plaintiff suffered from severe personal injuries, including gastrointestinal bleeding. Plaintiff specifically avers that Defendants' Pradaxa was defectively designed, inadequately tested, dangerous to human health,

and lacked proper warnings as to the true danger associated with its use, and that Plaintiff suffered injury as a result of his ingestion of Pradaxa™.

2. Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer US") is a Delaware corporation, which has its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Boehringer US has conducted business and derived substantial revenue from within the State of Illinois. Boehringer US may be served through its registered agent in Illinois, CT Corporation System, 208 So Lasalle St, Suite 814, Chicago, Illinois 60604.

3. Boehringer Ingelheim International GmbH ("Boehringer International") is a foreign corporation with its principal place of business located at Boehringer Ingelheim International GmbH, Binger Strasse 173, 55216 Ingelheim am Rhein, Germany. Boehringer International has transacted and conducted business within the State of Illinois. Boehringer International has derived substantial revenue from goods and products disseminated and used in the State of Illinois and Boehringer International expected or should have expected their acts to have consequences within the State of Illinois, and derived substantial revenue from commerce within the State of Illinois.

4. Hereinafter, the above-referenced parties will be referred to as "Defendants."

**JURISDICTION AND VENUE**

5. Jurisdiction is proper in this court pursuant to 28 USC §1332 for the reason that there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy greatly exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs. This Court has jurisdiction over the non-resident Defendants because they have done business in the State of Illinois, have committed a tort in whole or in part in the State of Illinois and have continuing contacts with the State of Illinois.

6. Pursuant to 28 U.S.C. § 1391, venue is proper in this district. Venue is further proper in this Court under United States Judicial Panel on Multi-District Litigation Transfer Order and Case Management Order #7, dated October 3, 2012, and Case Management Order #12, dated October 19, 2012, by Honorable Chief Judge David R. Herndon.

## UNDERLYING COMMON FACTS

7. Defendants, directly or through their agents, apparent agents, servants or employees, are and at all relevant times have been engaged in the business of formulating, designing, manufacturing, licensing, testing, advertising, marketing, warranting, selling, distributing, and introducing into the stream of commerce a drug compound known as "dabigatran etexilate," which Defendants have sometimes marketed under the brand name "Pradaxa." Regardless of the name under which Defendants marketed, sold, and distributed the drug, all of its forms were and are, for all purposes relevant to Plaintiff's claims, chemically and pharmacologically identical. Plaintiff, for purposes of this Complaint, will refer to the drug compound by the common brand name, "Pradaxa™."

8. Pradaxa™ was approved by the Food and Drug Administration ("FDA") in October of 2010, for prevention of stroke in patients with non-valvular atrial fibrillation. Pradaxa™ is an oral anticoagulant and is from the class of the direct thrombin inhibitors ("DTI"). According to the Defendants' website, Pradaxa™ is "at the forefront of a new generation of oral blood thinning treatments, which prevent blood clots from forming in the body that can lead to devastating strokes in patients with atrial fibrillation. Potent antithrombotic effects are achieved with DTIs by specifically blocking the activity of thrombin (both free and

clot-bound), the central enzyme in the process responsible for thrombus formation."[1] Indeed, Pradaxa™ is the first new treatment alternative to warfarin (Coumadin) in nearly 60 years.

9. Pradaxa™ was launched by Defendants in North America in 2010. Defendants designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Pradaxa™ as a blood-thinning medicine primarily used to reduce the risk of stroke and blood clots in people with atrial fibrillation not caused by a heart valve problem.

10. According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, atrial fibrillation ("AF") is the most common sustained heart rhythm condition in the world, with one in four adults over the age of 40 developing the condition in their lifetime.[2]

11. As the Defendants state on their website, "[AF] is a type of irregular heartbeat. It occurs when one or both of the upper chambers of the heart—called the atria—beat erratically. This puts them out of sync with the heart's 2 lower chambers—called the ventricles."[3] Because the atria are primer pumps for the two large ventricles, AF normally causes only a modest reduction in cardiac output. But in the "dead zone" of the malfunctioning atria, blood clots may form and then travel to the lungs or brain, where irreversible and potentially life-threatening damage may occur.[4]

12. Defendants claim that approximately one percent of the total population is affected by AF worldwide, or approximately 70+ million people in the world, and more than 2 million people in the United States alone have AF. AF is a disease that typically has an impact on aging populations, and indeed, its prevalence increases with age.

---

[1] http://www.boehringer-ingelheim.com/products/prescription_medicines/stroke_prevention.html
[2] http://www.boehringer-ingelheim.com/news/news_releases/press_releases/2011/4_aug_2011_dabigatran.html
[3] http://www.pradaxa.com/understanding-afib.jsp
[4] Institute for Safe Medication Practices, QuarterWatch Report, January 12, 2012

13.     Defendants posit that AF is not a directly life-threatening condition, but in their marketing materials, Defendants state that AF can have serious and even deadly consequences for patients. Defendants further declare that patients with AF are more likely to experience the development of a blood clot in their heart, especially if their condition is left untreated. If such a clot were to form, the blood clot could break loose, and after breaking loose, the clot can be washed into the brain, where it can block an artery and cause a stroke. Defendants state that patients with AF thus "have a five-fold increased risk of stroke when compared to people without atrial fibrillation. Up to three million people worldwide suffer strokes related to AF each year. Strokes due to AF tend to be severe, with an increased likelihood of death and disability."[5] Defendants claim their medication, Pradaxa™, is the answer to the worldwide problem of strokes and blood clots in those with AF. They claim, "Many AF-related strokes can be prevented with appropriate medicinal therapy. For this, substances are used which act on the blood clotting system and shall prevent blood clots from forming."[6]

14.     Historically, conditions such as AF have been treated with the prescription drug warfarin, which is a form of rat poison. Warfarin blocks the formation of the tiny fibrin threads that help hold together the platelets that collect in a person's blood to form a blood clot. Like all blood thinners, warfarin can cause bleeds.  Warfarin has two other noteworthy limitations: (1) it requires blood tests every 1 to 4 weeks to establish the optimal level of anticoagulation, and (2) it interacts (negatively) with scores of other drugs, including drugs frequently used in heart patients.  In spite of these apparent limitations; however, warfarin also has an important benefit;

---

[5] http://www.boehringer-ingelheim.com/products/prescription_medicines/stroke_prevention.html
[6] *Id.*

5

if an overdose or unexpected bleed occurs, an antidote (e.g., vitamin K) is readily available and highly effective.[7]

15. According to Defendants' testing and marketing materials, which extol the supposed benefits and virtues of Pradaxa™, Pradaxa™ had fewer drug interactions than warfarin, and the frequent laboratory tests needed to manage warfarin blood levels were not recommended for patients taking Pradaxa™. Moreover, unlike warfarin, which is adjusted for individual patient blood levels on an ongoing basis, Pradaxa™ was approved in an allegedly easy "one size fits all" dose of 150 mg twice a day. This "one size fits all" characteristic of the drug, while simple for physicians to follow, means that a lower (or personalized) dose is unavailable and patients ingesting Pradaxa™ are not routinely monitored to see if they are getting too much of the drug's active ingredient, as are patients on other blood thinning medications like warfarin.

16. Moreover, the "RE-LY Clinical Trial" (Randomized Evaluation of Longterm anticoagulant therapy) sponsored by Defendants concluded that vitamin K antagonists such as warfarin are cumbersome to use because of their multiple interactions with food and drugs and because these drugs require frequent laboratory monitoring. The RE-LY Clinical Trial went on to suggest that there is a need for new anticoagulant agents that are effective, safe, and convenient to use (i.e., Defendants' product, Pradaxa™). The Defendants' marketing materials suggest that Pradaxa™ represented a therapeutic simplification and therapeutic progress because it does not require patients to undergo periodic monitoring with blood tests. A fundamental tenet of the RE-LY Clinical Trial was a claim by Defendants that Pradaxa™ was apparently safe to use as compared to warfarin. As the Defendants highlight on their website in claiming Pradaxa™ generally has similar, but lower overall total bleeds versus warfarin.[8]

---

[7] Institute for Safe Medication Practices, QuarterWatch Report, January 12, 2012
[8] http://www.pradaxapro.com/safety.jsp

17. What the RE-LY Clinical Trial seemed to prove was quite simple: With Pradaxa™ there is (1) a higher rate of major GI bleeds (1.6% vs 1.1%) as compared to warfarin; and (2) a similar rate of major bleeds (3.3% vs 3.6%) as compared to warfarin. Additionally, Pradaxa™ appears to be particularly dangerous when used in older patients, as the label states: "The risk of major bleeds was similar with PRADAXA™150 mg and warfarin across major subgroups defined by baseline characteristics, with the exception of age, where there was a trend towards a higher incidence of major bleeding on PRADAXA™ (HR 1.2, 95% CI: 1.0 to 1.4) for patients ≥75 years of age."[9] In spite of this reference regarding age, the label is still wholly inadequate because, among other reasons, this information was not conveyed in the warnings section. In essence, the Defendants have created a new drug, Pradaxa™, that is no better than warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer. The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but it ignores patient safety.

18. On February 14, 2011, the American College of Cardiology Foundation and American Heart Association added Pradaxa™ to their guidelines for management of non-valvular atrial fibrillation with a "Class I" recommendation. The endorsement, along with heavy marketing from the Defendants, caused sales of Pradaxa™ to skyrocket. By the end of the first quarter of 2011, IMS Health's National Prescription Audit data showed 272,119 dispensed outpatient prescriptions. But, as prescriptions mounted, reports of serious adverse drug events also surged.[10]

19. As a result of the defective nature of Pradaxa™, persons who were prescribed and ingested Pradaxa™ for even a brief period of time, including Plaintiff herein, was at increased

---

[9] http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/022512s009lbl.pdf
[10] Institute for Safe Medication Practices, QuarterWatch Report, January 12, 2012

7

risk for developing life-threatening bleeds. Due to the flawed formulation of Pradaxa™ (and unlike any of the traditional blood thinners on the market, Pradaxa™ has a questionable "one size fits all" dose), its levels in the blood are difficult or impossible to assess, and bleeds cannot be stopped since there is no known reversal antidote for this dangerous drug.

20.     In November 2011, Defendants confirmed at least 260 fatal bleeding events were reported in patients taking Pradaxa™ worldwide between March 2008 and October 2011. The actual number of Pradaxa™ related deaths remains unknown at this time.

21.     Moreover, The Institute for Safe Medication Practices, reported that:

In the first quarter of 2011 [Pradaxa™] produced two different kinds of signals of major drug risk: a large volume of total serious reports, and large numbers of reports for a specific adverse event, hemorrhage. Overall [the study] identified 932 serious adverse drug events of all types in which [Pradaxa™] was the primary suspect drug, including 120 patient deaths, 25 cases of permanent disability, and 543 cases requiring hospitalization. For the quarter, this was a higher total than for any drug [The Institute for Safe Medication Practices] monitor[s] with one exception. In the Standardized MedDRA Query ("SMQ") for Hemorrhage, [Pradaxa™] accounted for 505 cases, more than any other drug. (Warfarin ranked second with 176 cases.) The 932 overall [Pradaxa™] cases in the first quarter [of 2011] included 293 cases that were also classified in the narrower gastrointestinal hemorrhage SMQ, more than any other regularly monitored drug. An additional 120 cases contained event terms in the Hemorrhagic stroke SMQ. The strokes are of particular concern because if treatment intended to prevent ischemic strokes then causes hemorrhagic strokes the risk/benefit balance is called into fundamental question. In 65 hemorrhage cases overall, the patients died.[11]

In other words, the deadly consequences of Pradaxa™ use did not go unnoticed.

22.     On December 7, 2011, the FDA initiated an investigation into serious bleeding events associated with Pradaxa™ stating that the "FDA is working to determine whether the reports of bleeding in patients taking Pradaxa™ are occurring more commonly than would be expected, based on observations in the large clinical trial that supported the approval of Pradaxa™ [RE-LY trial]."

---

[11] Institute for Safe Medication Practices, QuarterWatch Report, January 12, 2012

8

23.     Defendants concealed their knowledge that Pradaxa™ can cause life threatening, reversible bleeds from Plaintiff, other consumers, the general public, and the medical community. Indeed, the Defendants did not warn of the irreversible nature of Pradaxa™ in the "Warnings and Precautions" section of the products initial warning label. The only warnings provided by Defendants were as follows:

--------------------WARNINGS AND PRECAUTIONS-------------------

- Risk of bleeding: PRADAXA can cause serious and sometimes, fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.1)
- Temporary discontinuation: Avoid lapses in therapy to minimize stroke (5.2)
- P-gp inducers and inhibitors: avoid co-administration of rifampin with PRADAXA because of the effects of dabigatran exposure (5.3).

24.     Specifically, Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Pradaxa™ usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur. Even in the expanded "Warnings and Precautions" section of the initial label only the following meager and unacceptably inadequate information was given:

**5. WARNINGS AND PRECAUTIONS**

**5.1 Risk of Bleeding**

PRADAXA increases the risk of bleeding and can cause significant and, sometimes, fatal bleeding.  Risk factors for bleeding include the use of drugs that increase the risk of bleeding in general (e.g. anti-platelet agents, heparin, fibrinolytic therapy, and chronic use of NSAIDs) and labor and delivery. Promptly evaluate any signs or symptoms of blood loss (e.g., a drop in hemoglobin and/or hematocrit or hypotension). Discontinue PRADAXA in patients with active pathological bleeding.

In the RE-LY (Randomized Evaluation of Long-Term Anticoagulent Therapy) study, a life-threatening bleed (bleeding that met one or more of the following criteria: fatal, symptomatic, intracranial, reduction in hemoglobin of at least 5 grams per deciliter, transfusion of at least 4 units of blood, associated with hypotension requiring the use of intravenous inotropic agents or necessitating

surgical intervention) occurred at an annulized rate of 1.5% and 1.8% for PRADAXA 150 mg and warfarin, respectively [*see Adverse Reactions (6.1.)*].

25.   In fact, the only section of Defendants original label that references the fact that Pradaxa™ has no known "reversal agent" is buried in section 10 of the "Full Prescribing Information" section of the Pradaxa™ label, which discusses "Overdosage" on the medication. The language in section 10 is effectively no warning at all as the "warning" is both inadequate and misplaced, as shown below:

> **10 OVERDOSAGE**
>
> Accidental overdose may lead to hemorrhagic complications. There is no reversal agent for dabigatran. In the event of hemmorhagic complications, initiate appropriate clinical support, discontinue treatment with PRADAXA, and investigate the source of bleeding. Dabigatran is primarily excreted in the urine and shows low plasma protein binding. Therefore, dabigatran can be dialyzed with the removal of about 60% of drug over 2 to 3 hours; however, data supporting this approach are limited. Measurement of PTT or ECT may help guide therapy. [*see Warnings and Precautions (5.1) and Clinical Pharmacology 12.2*].

26.   Finally, in January of 2012, after thousands of Pradaxa™ users had been killed or injured as a result of their ingestion of Pradaxa™, the Defendants belatedly initiated an extremely modest, and wholly inadequate, label change. The only labeling modification Defendants made in January 2012, regarding the irreversible nature of Pradaxa™ bleeds was made in the "Warnings and Precautions" part of the "Full Prescribing Information" section of the Pradaxa™ label, buried in small print on the fifth and sixth pages of the label. It reads:

> 5. WARNINGS AND PRECAUTIONS
>
> 5.1 Risk of Bleeding
> PRADAXA increases the risk of bleeding and can cause significant and, sometimes, fatal bleeding.  Discontinue PRADAXA in patients with active pathological bleeding. [*see Dosage and Administration (2.2).*].
> \*\*\*
> Risk factors for bleeding include the use of drugs that increase the risk of bleeding in general (e.g. anti-platelet agents, heparin, fibrinolytic therapy, and chronic use

10

of NSAIDs). PRADAXA's anticoagulant activity and half-life are increased in patients with renal impairment. [*See Clinical Pharmacology (12.2.)*].

A specific reversal agent for dabigatran is not available. Dabigatran can be dialyzed (protein binding is low, the removal of about 60% of drug over 2-3 hours); however, the amount of data supporting such an approach is limited. Activated prothombin complex concentrates (aPCCs, e.g. FEIBA), or recombinant Factor VIIa, or concentrates of coagulation factors II, IX or X may be considered but their use has not be evaluated in clinical trials. Protamine sulfate and vitamin K are not expected to affect the anticoagulant activity of dabigatran. Consider administration of platelet concentrates in cases where thrombocytopenia is present or long-acting antiplatelet drugs have been used.

27. Importantly, Pradaxa™ still does not have a "black box" warning letting patients or their prescribing doctors know that Pradaxa™ can cause sudden and irreversible bleeds. Indeed, the relevant part of the "Warnings and Precautions" section itself remains unchanged (with no reference to the irreversible nature of Pradaxa™ bleeds) on the current Pradaxa™ label as shown below:

--------------------WARNINGS AND PRECAUTIONS-------------------

- Risk of bleeding: PRADAXA can cause serious and sometimes, fatal bleeding. Promptly evaluate signs and symptoms of blood loss. (5.1)
- Temporary discontinuation: Avoid lapses in therapy to minimize stroke (5.2)
- P-gp inducers and inhibitors: Effects of dabigatran exposure (5.3).

28. The current warning is simply inadequate. The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Plaintiff herein.

29. Even if the warnings were sufficient, which Plaintiff strongly denies, Pradaxa™ still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug. Pradaxa™ is quite simply dangerous and defective as formulated. Defendants should withdraw Pradaxa™ from the market.

11

30. Indeed, a FDA analysis showed that with Pradaxa™ treatment, life threatening bleeds (a drug adverse effect) occurred at a higher rate than the strokes or systemic embolisms Pradaxa™ is intended to prevent (1.5% per year versus 1.1% a year), suggesting that Pradaxa™ creates an extreme risk for patients and provides no benefit whatsoever. Pradaxa™, under the guise of providing a safe defense against strokes and/or embolisms in AF patients, subjects unsuspecting patients to new dangers of death and injury.[12] Defendants willfully, wantonly and with malice withheld the knowledge of increased risk of irreversible bleeds in users of Pradaxa™ to prevent any chances of their product's registrations being delayed or rejected by FDA. As the manufacturers and distributors of Pradaxa™, Defendants knew or should have known that Pradaxa™ use was associated with irreversible bleeds.

31. With the knowledge of the true relationship between use of Pradaxa™ and irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Pradaxa™ as a safe and effective treatment for AF and alternative to warfarin. Pradaxa™ is expected to be one of Defendants' top selling drugs. Upon information and belief, Defendants "expect[s] sales of blood thinner Pradaxa™ to reach 450 million euros ($603 million) this year."[13]

32. While Defendants enjoy great financial success from their expected blockbuster drug, Pradaxa™, they continue to place American citizens at risk of severe bleeds and death. Consumers, including Plaintiff, who have used Pradaxa™ for treatment of AF and blood thinning, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits, associated with Pradaxa™ therapy.

---

[12] Institute for Safe Medication Practices, QuarterWatch Report, January 12, 2012
[13] http://www.bloomberg.com/news/2011-11-28/boehringer-expects-2011-pradaxa-sales-of-603-million-dpasays

33.     Defendants, through their affirmative misrepresentations and omissions, failed to warn Plaintiff and Plaintiff's physicians of the true and significant risks associated with Pradaxa™ use.

34.     Consumers, including Plaintiff, who have used for treatment of AF and blood thinning, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits associated with Pradaxa™ therapy.

35.     As a result of Defendants' actions, Plaintiff and Plaintiff's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint. The increased risks and subsequent medical damages associated with Plaintiff's Pradaxa™ use was the direct and proximate result of Defendants' conduct.

36.     Pradaxa™ was and is a defective product, unreasonably dangerous in light of its nature and intended use.  That defect existed when the product left Defendants' control and has been the proximate cause of injuries to Plaintiff, whose injuries was caused by the use of Pradaxa™ in its intended or foreseeable manner or in the manner recommended by Pradaxa™.

37.     Defendants knew or should have known of the dangerous condition of its product, Pradaxa™, but failed to adequately warn or instruct physicians and consumers of the risks, dangers, and proper uses of the drug.

38.     Defendants have breached their duty of reasonable care in connection with the design, testing, manufacture, marketing, and/or labeling of Pradaxa™.

39.     Plaintiff would not have used Pradaxa™ had Defendants properly disclosed the risks associated with its use.

40. Plaintiff continues to suffer permanent injury, pain, loss of normal life, and other non-economic damage. As a direct and proximate result of the aforesaid acts of and/or omissions by Defendants, Plaintiff has, *inter alia*,

   a. suffered severe and permanent injuries, which he will be forced to endure for the remainder of his life;

   b. suffered physical impairment and disfigurement;

   c. suffered physical pain and suffering;

   d. suffered mental pain and suffering;

   e. suffered loss of enjoyment of life;

   f. incurred substantial costs for medical care in the past, and will in reasonable medical probability incur substantial costs for medical care in the future; and

   g. suffered a loss of earnings and future earning capacity.

## EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

41. Defendants failed to disclose a known defect and affirmatively misrepresented that Pradaxa™ was safe for its intended use.  Further, Defendants actively concealed the true risks associated with the use of Pradaxa.  Neither Plaintiff nor Plaintiff's prescribing physicians had knowledge that Defendants were engaged in the wrongdoing alleged herein.  Because of Defendants' concealment of and misrepresentations regarding the true risks associated with Pradaxa, Plaintiff could not have reasonably discovered Defendants' wrongdoing at any time prior to the commencement of this action.

42. Thus, because Defendants fraudulently concealed the defective nature of Pradaxa™ and the risks associated with its use, the running of any statute of limitations has been tolled.  Likewise, Defendants are estopped from relying on any statute of limitations.

## CAUSES OF ACTION

### COUNT I: Strict Products Liability

43. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth in the following paragraphs.

44. It was the duty of Defendants to manufacture, test, market, advertise, label, distribute, and sell Pradaxa™ so that it was reasonably safe for its foreseeable use. At the time Pradaxa™ left the control of Defendants and was sold, it contained one or more conditions which rendered it defective and unreasonably dangerous in light of its nature and intended use. At all times, Pradaxa™ was used in the manner intended, recommended, or reasonably foreseeable by Defendants. There were and are no other reasonable, secondary causes of Plaintiff's injuries and damages other than the use of Pradaxa™.

45. The Pradaxa™ manufactured and/or supplied by Defendants and to which Plaintiff was exposed was defective in design, manufacture, and/or formulation in that when it left the hands of Defendants, the foreseeable risks exceeded the benefits associated with the design and/or formulation of this product.

46. The Pradaxa™ marketed, sold, and supplied by Defendants and to which Plaintiff was exposed was defective in its marketing and labeling in that Defendants knew or should have known of its dangers and risks of irreversible bleeding, but failed to adequately warn or instruct physicians, consumers, and the general public of the nature and extent of those risks.

47. The Pradaxa™ marketed, sold, and supplied by Defendants and to which Plaintiff was exposed was defective in its marketing and labeling in that Defendants knew or should have known of its dangers and risks, as well as the means for reducing or eliminating those dangers

and risks, but failed to adequately warn or instruct physicians, consumers, and the general public of those means of reducing or eliminating the risks.

48. The Pradaxa™ marketed, sold, and supplied by Defendants was defective in marketing in that Defendants represented to the consuming public that the product was safe and had qualities that it, in fact, did not have.

49. The Pradaxa™ manufactured and/or supplied by Defendants was defective in design and formulation in that it was more dangerous than an ordinary consumer would expect when used in its intended or reasonably foreseeable manner.

50. The Pradaxa™ manufactured and/or supplied by Defendants was defective in that Defendants failed to adequately test this product before placing it into the stream of commerce.

51. As a direct and proximate result of the defective condition of Pradaxa™ as manufactured by Defendants, Plaintiff suffered the injuries and damages described herein.

**COUNT II: Negligence**

52. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth in the following paragraphs.

53. Defendants had a duty to exercise reasonable care in the design, manufacture, testing, sale, labeling and/or distribution of Pradaxa™ it placed into the stream of commerce, including a duty to assure that the product did not cause unreasonable or unnecessary injury.

54. Defendants breached its duty of care to the Plaintiff through its negligent acts and omissions. Defendants did not exercise reasonable care in the warning, design, manufacture, sale, testing, labeling and/or distribution into the stream of commerce of Pradaxa™ in that Defendants knew or should have known that Pradaxa™ could cause serious adverse events,

including irreversible bleeding, but failed to warn that the drug was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.

55. Defendants were negligent in the design, manufacture, sale, testing, and/or distribution of Pradaxa™ in that it: (a) failed to use due care in designing, formulating, developing, testing, and manufacturing Pradaxa™ so as to avoid or warn against the described risks to consumers who used Pradaxa™; (b) placed an unsafe product into the stream of commerce; (c) failed to discover or warn of the dangers associated with the use of Pradaxa™ despite having actual and/or constructive knowledge of such dangers; (d) representing to physicians, including but not limited to Plaintiff's prescribing physicians, that this drug was safe and effective for use when it is not; and (e) failing to remove Pradaxa™ from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users.

56. Defendants knew or should have known that Plaintiff could foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described above.

57. As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries and damages described herein.

## DAMAGES

58. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth in the following paragraphs. The facts set out above demonstrate that, as a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe economic and non-economic losses and injuries for which they are entitled to recover damages.

59. Plaintiff is entitled to recover the following damages, including without limitation the following:

(a) disfigurement, conscious pain, suffering, mental anguish, mental suffering, embarrassment, shame, loss of enjoyment of life, loss of association, loss of earnings, loss of profits, loss of salary;

(b) the reasonable and necessary expenses for the medical treatment rendered to Plaintiff in the past and that will be medically probable in the future;

(c) compensation for Plaintiff's permanent mental and physical impairment;

(d) all other actual damages available under applicable law;

(e) future economic damages, including lost wages of Plaintiff; and

(f) costs of this suit.

## **PRAYER**

WHEREFORE, Plaintiff asks that Defendants Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH be cited to appear and answer herein. That, upon final trial, Plaintiff have judgment against Defendants Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH for actual damages, costs of court, and any other relief to which Plaintiff may be entitled.

Respectfully submitted,

BY:   /s/Lisa Causey

Robert L. Salim
Lisa L. Causey
SALIM-BEASLEY, L.P.
1901 TEXAS STREET
NATCHITOCHES, LA 71457
PHONE: (318) 352-5999
FAX: (318) 352-5998
Email: robertsalim@cp-tel.net
Email: lcausey@salim-beasley.com

Christopher Cueto
LAW OFFICE OF CHRISTOPHER CUETO, LTD.
7110 WEST MAIN STREET
BELLEVILLE, IL 62223
PHONE: (618) 277-1554
FAX:  (618)-277-0962

EMAIL: ccueto@cuetolaw.com

Robert Cowan
BAILEY PEAVY BAILEY, PLLC
440 LOUISIANA, 21ST FLOOR
HOUSTON, TX 77002
PHONE: (713) 425-7100
FAX: (713) 425-7101
EMAIL: rcowan@bpblaw.com

ATTORNEYS FOR PLAINTIFF